IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 CR 542 |
| | ) | |
| ALEXANDRA PROKOS, | ) | |
| also known as Andrea Prokos, and | ) | |
| Andrea Coutretsis | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On December 3, 2003, defendant Alexandra Prokos, who is also know as Andrea Coutretsis, (hereinafter "Coutretsis")[1] entered into a plea agreement with the United States (hereinafter "Government") which was filed with the court. (Dkt. No. 22). The Government and Coutretsis seek leave from the court to replace that 2003 plea agreement ("2003 Agreement") with a new proposed plea agreement. This court has reviewed the proposed plea agreement along with the briefs and supporting exhibits provided by the parties. (Dkt. Nos. 27, 28, 30, 32, 33). The court also conducted an in-court hearing on October 28, 2004. (Dkt. No. 31). The court, at the parties' request, agreed in December 2004 to postpone the consideration of proposed plea agreement until a related case progressed to the post-trial stage. (Dkt. No. 36). The court, with the parties' concurrence, now returns to its evaluation of the proposed plea agreement and this court has received further briefing from the parties. (Dkt. Nos. 38, 43, 44). For the reasons

---

[1] Prokos is the defendant's married name and Coutretsis is her maiden name. The court understands that the defendant wishes to be known by her maiden name.

set forth below, this court tentatively accepts the proposed amended plea agreement pursuant to Rule 11(c)(4) and hereby informs the parties thereof.

BACKGROUND

On May 28, 2003, the Special April 2002 Grand Jury returned an eight-count indictment against Coutretsis alleging that she knowingly made false material declarations to the Special July 2000-2 Grand Jury in connection with Grand Jury Investigation No. 98 GJ 596 in violation of 18 U.S.C. § 1623. (Dkt. No. 1). Pursuant to the December 3, 2003 plea agreement, Coutretsis agreed to plead guilty to Count One and acknowledged that she knowingly made a false declaration in her testimony before the Grand Jury on December 4, 2001. She also agreed, for the purposes of considering her relevant conduct pursuant to the United States Sentencing Commission Guidelines Manual ("Guidelines"), § 1B1.3, that she knowingly made false declarations during her testimony before the Grand Jury on April 10, 2001, May 29, 2001, July 17, 2001, July 31, 2001, December 4, 2001 and January 8, 2002. (*Id.* at pgs. 6-10).

Under the proposed plea agreement, Coutretsis' fiancé, Scott Fawell ("Fawell") agreed to cooperate in the Government's investigation of misconduct that had occurred during George H. Ryan's ("Ryan") tenure as Secretary of State and Governor of Illinois. Fawell provided a detailed proffer to the Government and testified during the Ryan trial. (02 CR 506) (Pallmeyer, J.). Fawell and Coutretsis both agreed to plead guilty in an additional case involving misconduct at the Metropolitan Pier and Exposition Authority ("McPier"), (04 CR 147) (Manning, J). The Government agreed to drop the other charges against Fawell and Coutretsis in this case and the McPier case and seek reductions in their sentences. If approved by this court, and by Judges

Manning and Pallmeyer,[2] the collective effect would be to limit Coutretsis to an imprisonment range of zero months to 12 months and a day. Coutretsis is free to argue for any sentence and the Government agrees to recommend a six-month sentence in this case. Fawell, who is already serving time in prison, now faces a maximum imprisonment of 78 months with a possible six-month reduction. It is the parties' position that the proposed plea agreement would not have been reached without the substantial efforts of Coutretsis to convince Fawell to cooperate with the Government. Fawell conditioned his cooperation on Coutretsis receiving a benefit. In doing so, Fawell bartered away other sentencing benefits that he could have received for himself from the Government in exchange for better sentencing benefits for Coutretsis.

## ANALYSIS

A. Law of Vicarious / Third-Party Cooperation

The parties have not identified any Seventh Circuit case law directly addressing the appropriateness of the proposed agreement.[3] Two judges in the Northern District of Illinois have considered the issue to some extent. *See,* e.g., United *States v. Ivy*, 01 CR 121 (Hibbler, J.); *United States v. McDowell*, 94 CR 787-1 (Conlon, J.). The four reported cases considering the

---

[2] This court's consideration of the proposed plea agreement applies only to Coutretsis in the pending case. This court will not address the proposed plea agreement as it applies to the cases before Judges Manning and Pallmeyer whom the court is confident will fully evaluate all the circumstances before imposing a fair and reasonable sentence.

[3] On July 19, 2006, the Seventh Circuit in *United States v. Spilmon* held that it is permissible to structure a plea agreement in which the prosecutor agrees to drop charges against a defendant's loved one in exchange for a defendant's guilty plea. – F.3d –, No. 05-3750, 2006 WL 2007640 (7th Cir. July 19, 2006). *Spilmon*, however, focused on the issue of the voluntariness of the defendant's plea while Coutretsis' case involves whether she maybe allocated a sentencing benefit for cooperation provided by Fawell in recognition of her efforts to convince Fawell to cooperate.

3

issue are: *United States v. Doe*, 870 F. Supp. 702 (E.D. Va. 1994) (Ellis, J.); *United States v. Bush*, 896 F. Supp. 424 (E.D. Pa. 1995) (Dalzell, J.); *United States v. Abercrombie*, 59 F. Supp. 2d 585 (S.D.W. Va. 1999) (Goodwin, J.); *United States v. Scott*, No. Crim. 98-1793 ADMAJB, 2005 WL 741910 (D. Minn. Mar. 31, 2005) (Montgomery, J.).

The *Doe* court, through a review of § 5K1.1 and Rule 35(b), developed a four-part test for determining whether a defendant should receive a benefit for the surrogate assistance provided by a third-party to the Government. The *Doe* test requires that "(1) the defendant plays some role in instigating, requesting, providing, or directing the assistance; (2) the Government would not have received the assistance but for the defendant's participation; (3) the assistance is rendered gratuitously; and (4) the court finds that no other circumstances weigh against rewarding the assistance." 870 F. Supp. at 708. The *Doe* court permitted the allocation of a benefit to a father from his son when the father facilitated the son's cooperation in the investigation of a drug dealer. The *Bush* court considered the *Doe* test but rejected the allocation of a benefit to the defendant from her paramour because the defendant took no actions to facilitate the paramour's assistance. 896 F. Supp. at 426. The *Abercrombie* court allowed the allocation of a benefit to the defendant from his girlfriend when the defendant facilitated the girlfriend's assistance in investigating two drug dealers. 59 F. Supp. 2d 585. However, the *Abercrombie* court rejected the *Doe* court's analysis, concluding that Guidelines' § 5K2.0, not § 5K1.1, controlled and developed its own somewhat similar four-part test. The *Scott* court rejected the entire concept of allocating a benefit from a third-party to the defendant on policy concerns. No. Crim. 98-1793 ADMAJB, 2005 WL 741910, at *2-*3. The *Scott* court concluded that allowing the allocation impermissibly created an incentive for the defendant to obtain cooperation from the third-party

4

through bribery or coercion. *Id*.

B. The Effect of *United States v. Booker* on Vicarious Third-Party Cooperation Agreements

The parties presented the proposed plea agreement to the court in the fall of 2004 and argued that it should be approved pursuant to the four-part test set forth in *Doe*.[4] At the October 28, 2004 in-court hearing, this court recognized that *Doe*, although not binding, was the leading authority. However, in January 2005, the Supreme Court decided *United States v. Booker* altering the Guidelines from mandatory to advisory in application. 543 U.S. 220 (2005). The Seventh Circuit has instructed that *Booker* effectively eliminated the concept of a downward departure.

> Before *Booker*, departures were the principle means of sentencing outside of the range specified by the Guidelines. Now that *Booker* has rendered the Guidelines advisory and district courts have much broader authority to sentence outside the recommended range, departures are beside the point. The district court's obligation in every instance is to consult the Guidelines and, taking into account the sentencing factors set forth in § 3553(a), to impose a reasonable sentence. Our obligation, in turn, is to determine whether the sentence imposed, be it within or without the Guidelines range, is reasonable.

*United States v. Laufle*, 433 F.3d 981, 987 (7th Cir. 2006) (citing *United States v. Johnson*, 427 F.3d 423, 426-27 (7th Cir. 2005)); *see e.g.*, *United States v. Hewlett*, – F.3d –, Nos. 05-2532, 05-2571, 05-2853, 2006 WL 1881136, at *4 (7th Cir. July 10, 2006) (Easterbrook, J., concurring) ("*Booker* rendered the departure apparatus and terminology archaic.").

Vicarious third-party cooperation agreements are based on the concept of downward departure and so this court must determine the effect of *Booker*. The Supreme Court's directive is that the court must look "to legislative intent ... to determine what 'Congress would have

---

[4] The parties also argued that the proposed plea agreement should be approved even if the court decided to apply a standard other than the four-part *Doe* test.

5

intended' [under the Guidelines] in light of the [Supreme Court's] constitutional holding" in *Booker*. 543 U.S. 220, 246 (2005) (Breyer, J.) (citations omitted). Congress has explicitly endorsed the executive branch's ability to barter for substantial assistance in exchange for reductions in sentence. *See* 18 U.S.C. § 3553(e) (allowing, upon the motion of the Government, for the imposing of a sentence below the statutory mandatory minimum sentence to reflect a defendant's substantial assistance in the investigation or prosecution of another); 28 U.S.C. § 994(n) (instructing the Sentencing Commission to assure that the Guidelines reflect the appropriateness of imposing a lower sentence in account for a defendant's substantial assistance in the investigation or prosecution of another). Section 5K1.1 is the Guidelines' implementation of Congress' directive under § 3553(e) and § 994(n). *See* U.S.S.G. § 5K1.1 Application Note 1. A reduction in sentence in exchange for substantial assistance of the Government pursuant § 5K1.1 remains an important part of the Guidelines despite the fact that the *Booker* eliminated the need for a downward departure. *See United States v. Blue*, – F.3d –, No. 05-3717, 2006 WL 1970379, at *4 (7th Cir. July 14, 2006) (quoting *United States v. Zingsheim*, 384 F.3d 867, 870 (7th Cir. 2004) ("*Booker* ... rendered departures obsolete [but] the rationale for rewarding defendants who have been helpful to the Government with below-Guidelines sentences remains: it arms the Government with 'an inducement that can be used to solve old crimes and deter new ones.'")). This court concludes that surrogate third-party agreements, as a subset of substantial assistance agreements, survived *Booker*.

C. The Proper Legal Standard for Surrogate Third-Party Agreements

In determining the properly legal standard, this court disagrees with the *Scott* court's conclusion that surrogate third-party agreements must be universally rejected on public policy

grounds. Public policy concerns are present in any cooperation agreement regardless of whether a third-party is involved. In every case there is a risk that the defendant will seek a better position with the Government by lying under oath and fabricating evidence to create new information with which to barter, or seek new information through bribery or coercion. Congress decided that, as a matter of public policy, the benefits society obtains by allowing Government counsel to seek and obtain the cooperation of persons who have committed crimes outweigh the detriments to society when Congress enacted 18 U.S.C. § 3553(e) and 28 U.S.C. § 994(n).

This court also disagrees with the *Abercrombie* court's conclusion that Guidelines § 5K2.0 applies instead of Guidelines § 5K1.1 when third-party cooperation is involved.[5] Section 5K1.1 is the appropriate because it is the section designed to reward conduct that is directed to assist in the investigation and prosecution of another. *See* U.S.S.G. § 5K1.1 Application Note 2. The underlying purpose of § 5K1.1 is equally present whether the cooperating defendant provides all of the assistance or utilizes a third-party surrogate cooperator. This court recognizes, like the *Doe* court, that § 5K1.1 does not explain what quantity or quality of assistance by the third-party surrogate qualifies as "substantial assistance" under §5K1.1. The *Doe* court answered this issue through the development of the four-part test in *Doe*. This court, however, concludes that law of contracts, altered at certain points to satisfy Constitutional, statutory and Guidelines public policy concerns, is a better analytical framework for evaluating these agreements.

The Seventh Circuit has instructed that plea agreements between the Government and

---

[5] The court recognizes that § 3553(e) would be the applicable section for sentencing reductions below the statutory minimum sentence and Rule 35(b) applies for reductions in a sentence after the imposition of the sentence. The court concludes that its analysis as to § 5K1.1 applies equally to § 3553(e) and Rule 35(b) where applicable.

7

defendant are contracts and should be interpreted under contract law. *United States v. Bownes*, 405 F.3d 634, 636 (7th Cir. 2005). Under contract law, a defendant's substantial assistance facilitated through a third-party surrogate is part of the consideration supporting the agreement between the Government and the defendant. In evaluating the consideration supporting any agreement, the court is only permitted to determine whether sufficient consideration supports the contract, a court is not permitted to examine the adequacy or equities of the exchange between the parties unless there is mutual mistake or the deal is so unfair that justice prevents its enforcement. *See Scholes v. Lehmann*, 56 F.3d 750, 756 (7th Cir. 1995); Restatement (Second) of Contracts § 71 cmt. c (2006).

Limiting the court's evaluation of a plea agreement to the sufficiency of consideration is consistent with the prohibition on the court engaging in plea negotiations between the Government and defendant. *See United States v. O'Neill*, 437 F.3d 654, 657 (7th Cir. 2006) (Evans, J.) (citing Fed. R. Crim. P. 11(c)(1); *United States v. Kraus*, 137 F.3d 447, 452 (7th Cir. 1998) ("Judges [in federal court], it is well-settled, may not participate in plea negotiations. This proscription against judicial intervention in plea negotiations is widely construed as categorical. However, it is also certainly well-established that judges are permitted to take an active role in evaluating the agreement in Rule 11(c) cases.")). This limitation also respects the executive branch's authority, as a coequal branch of the United States Government, to enter into these agreements. *See United States v. O'Neill*, 437 F.3d 654, 659-60 (7th Cir. 2006) (Posner, J., concurring) ("The decision whether to give such a discount and if so how great [of] one is quintessentially an exercise of prosecutorial judgment, balancing the deterrent and incapacitative benefits to the [public] of a longer sentence against the benefits to the [public] of obtaining the ...

assistance and encouraging other criminals to assist."); *cf. Wade v. United States*, 504 U.S. 181, 185 (1992) (holding that a district court has limited authority to review the Government's refusal to bring a motion under § 3553(e) and § 5K1.1 because those sections provide the Government with "a power, not a duty, to file a motion when a defendant has substantially assisted."); *United States v. Giannattasio*, 979 F.2d 98, 100 (7th Cir. 1992) ("A [federal] judge in our system does not have the authority to tell prosecutors which crimes to prosecute or when to prosecute them. Prosecutorial discretion resides in the executive, not in the judicial branch, and that discretion, though subject of course to judicial review to protect constitutional rights, is not reviewable for a simple abuse of discretion."). The "but for" requirement in element two[6] of the *Doe* test places an impermissible limitation on the prosecutor's ability to enter into these type of agreements. The defendant must provide some level of assistance under the plain language of § 5K1.1, but the "but for" requirement does not provide the appropriate respect to the prosecutor's role in structuring these agreements. *See* U.S.S.G. § 5K1.1 Application Note 3 ("Substantial weight should be given to the Government's evaluation of the extent of the defendant's assistance, particularly where the extent and value of the assistance are difficult to ascertain.").

Contract law must also be tailored to meet public policy considerations set forth in the Constitution, statutes and the Guidelines, *see United States v. Cook*, 406 F.3d 485, 487 (7th Cir. 2005) (A plea agreement "is not *just* a contract ... it is also a stage in the criminal proceeding.") (emphasis in original); *United States v. Bownes*, 405 F.3d 634, 636 (7th Cir. 2005) (The use of contract law is "tempered by recognition of limits that the Constitution places on the criminal

---

[6] "(2) The Government would not have received the assistance but for the defendant's participation." 870 F. Supp. at 708.

process, limits that have no direct counterparts in the sphere of private contracting."), and the district court must impose a sentence that serves these policies. *See Mistretta v. United States*, 488 U.S. 361, 396 (1989). The court believes that elements three and four[7] of the *Doe* test error by setting forth general public policy considerations without grounding those public policy concerns in the court's sentencing function as set forth in § 3553(a).[8] *See United States v. Miller*, 450 F.3d 270, 275 (7th Cir. 2006) ("The judiciary is not free to replace Congress's approach [to sentencing] with one that it deems superior.").

The court must determine if the parties' agreement will allow it to impose an appropriate and reasonable sentence pursuant to 18 U.S.C. § 3553(a). *See United States v. Blue*, – F.3d –, No. 05-3717, 2006 WL 1970379, at *3 (7th Cir. July 14, 2006) (citing *United States v. Booker*, 543 U.S. 220, 259-60 (2005); *United States v. Laufle*, 433 F.3d 981, 987 (7th Cir. 2006) ("In every case, it is a district court's obligation to arrive at a reasonable sentence after consulting the Guidelines and taking into account the broad sentencing factors that Congress set forth in § 3553(a).")). The district court "is not obliged to accede to the Government's wishes, ... a

---

[7] "(3) The assistance is rendered gratuitously; and (4) the court finds that no other circumstances weigh against rewarding the assistance." 870 F. Supp. at 708.

[8] This court also disagrees with the *Doe* court's view that the third-party surrogate must "gratuitously" provide the assistance because the court concludes that all third-party's assistance will likely be motivated by some type of self interest, including as here, continuing a romantic relationship and family kinship. The question is not whether the cooperation is provided gratuitously, but instead whether imposing a reduction in sentence would be permissible under the policies set forth by Constitution, statutes and the Guidelines. The court does join the *Doe* court's conclusion that the wealthy should not be permitted to "purchase" a reduction in sentence. If the courts were to allow that to occur, it would undermine the public's confidence in the law, 18 U.S.C. § 3553(a)(2)(A), and the Constitutional requirement of equal treatment under the law.

prosecutorial request to recognize the defendant's assistance with a below-Guidelines sentence is one addressed to the district court's discretion." *Id.* at *4.

The Seventh Circuit has instructed that the district court determines the appropriate and reasonable sentence post-*Booker* by: (1) "calculat[ing] the appropriate advisory guidelines range; and (2) decid[ing] whether to impose a sentence within the range or outside of it, by reference to the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Robinson*, 435 F.3d 699, 700-01 (7th Cir. 2006). The district court must make a sufficient record to allow the court of appeals to determine whether the district court considered the applicable law, the defendant's arguments and did not abuse its discretion when imposing sentence. *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005). On review, the Seventh Circuit "reviews the district court's fact-finding for clear error and its interpretation of the Guidelines *de novo*." *Robinson*, 435 F.3d at 701 (citing *United States v. Baldwin*, 414 F.3d 791, 798 (7th Cir. 2005)). A sentence imposed within the properly calculated Guidelines range is entitled to a presumption of reasonableness that the defendant can rebut only by demonstrating that the sentence is unreasonable when evaluated under the § 3553(a) factors. *United States v. Farris*, 448 F.3d 965, 970 (7th Cir. 2006) (citing *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005)).

D.  Determining an Appropriate and Reasonable Sentence Under the Proposed Plea Agreement

The court concludes that in this case there has been a bargained-for exchange involving Coutretsis, Fawell and the Government and that Coutretsis has independently contributed to this exchange. The court also determines that it can impose an appropriate and reasonable sentence within the zero months to 12 months and a day Guidelines sentencing range established under the proposed plea agreement. Consequently, this court tentatively accepts the proposed amended

plea agreement pursuant to Rule 11(c)(4). A final acceptance will be made at the time of sentencing scheduled for July 31, 2006 at 1:30 p.m.

1. Coutretsis' Contributions to the Agreement with the Government

Coutretsis' contributed two items of value in the exchange with the Government: (1) she encouraged Fawell to cooperate with the Government, and (2) she supported Fawell when he cooperated with the Government. The Government has stated in its filings that Coutretsis' cooperation, when coupled with Fawell's cooperation, is adequate to satisfy the substantial assistance requirement of § 5K1.1. The court finds this to be sufficient consideration to support the proposed plea agreement.

In support of its conclusion, the court makes the following factual findings based on the in-court testimony presented at the October 28, 2004 hearing and the audio tapes and documents reviewed by the court *in camera*.[9] By November 2003, Coutretsis and Fawell had developed a close and personal relationship, and through that relationship, Fawell had developed a personal relationship with Coutretsis' two minor children. By Fall 2003, their relationship had progressed to the point of talking about marriage and Fawell had purchased an engagement ring for Coutretsis before he reported to prison in November 2003. (Oct. 28, 2004 Tr. at pg. 26). Coutretsis and Fawell's relationship continued to grow after Fawell began serving his sentence at Yankton. Coutretsis visited Fawell at Yankton on a regular basis. (*Id.*) They communicated by

---

[9] Fawell's telephone conversations from Yankton were recorded pursuant Bureau of Prisons policy. Fawell and Coutretsis were aware that their telephone conversations were being recorded under this policy. (Oct. 28, 2004 Tr. at pg. 33). There is no evidence that the Government singled out Fawell's conversations for recording from other prisoner's conversations. The Bureau of Prisons did not record Fawell and Coutretsis' in-person conversations during her visits at Yankton. (*Id.* at pg. 44).

mail and spoke on the telephone on a daily basis. (*Id.* at pg. 33).

According to Coutretsis, she had initially decided to go to trial on the charges in this case. (*Id.* at pg. 28). However, in early November 2003, the Government informed Coutretsis that she would be charged in the McPier case. Coutretsis testified that "once I learned of the new charges, I reevaluated the length of time that [I] was potentially going to be looking at and the impact that it would have on my kids and decided that cooperating was the right thing to do and the route that I should take." (*Id.* at pg. 28). Her decision to cooperate resulted in Coutretsis' 2003 Agreement. Coutretsis' initial belief in November 2003 was that cooperating with the Government meant that she would be asked by the Government to lie and push certain limits. Coutretsis, however, believed that she needed to do this for her children. (*Id.* at pg. 29).

Fawell had no desire to cooperate with the Government in November 2003 despite already having been convicted in the Citizens for Ryan case, (02 CR 310) (Pallmeyer, J.), and facing further criminal charges in the McPier case. (*Id.* at pgs. 29, 71). Fawell also believed that cooperating with the Government would require him to lie. (*Id.* at pg. 29). Fawell supported Coutretsis' decision to cooperate in order to help her children, despite a recognition that Coutretsis could be a witness against Fawell in a potential McPier case. (*Id.*)

Fawell's apparent distrust of and animosity toward the Government is demonstrated by the argument between Fawell and the prosecutors that occurred on January 15, 2004 when the prosecutors informed Fawell of the McPier charges. (*Id.* at pgs. 46, 74, 75). According to the statements set forth in the testimony of Fawell and Coutretsis and the Government's briefing, Fawell and the prosecutors got into an argument after the prosecutors had inquired into the possibility of Fawell's cooperation. (*Id.*) A second piece of evidence demonstrating Fawell's

13

apparent mistrust of the Government during the Fall 2003 and the beginning of 2004 was the testimony of Coutretsis about a conversation she had with Fawell in either November or December 2003. (*Id.* at pgs. 35-38). Coutretsis had begun the proffer process with the Government as part of her cooperation under the 2003 Agreement and had discussed with Fawell her experience. According to Coutretsis' testimony, she had made a "nice comment" about a Government prosecutor, Mr. Collins. (*Id.* at pg. 35) Coutretsis testified that Fawell became very angry in response to Coutretsis' comment and started yelling at her, "You're smarter than that. Don't let them fool you. You're still going to get screwed by this. Don't trust them. They're not your friends." (*Id.*)

Coutretsis stated during her October 28, 2004 testimony that at some point between December 3, 2003 and December 10, 2003 she discussed her disappointment about the 2003 Agreement with her attorney Ms. Cynthia L. Giacchetti ("Ms. Giacchetti"). (*Id.* at pg. 41). According to Coutretsis'

> It was always my hope that if I did this, [cooperate with the Government independent of Fawell's cooperation], I would be able to secure myself, to be in a position to be home with my children and not have to leave them. And when the 12 months turned out to be the best that was going to happen, [Coutretsis and Ms. Giacchetti] were still quite unhappy with that. And [Ms. Giacchetti] mentioned to me that, you know, maybe if something happened, maybe if [Fawell] ever ended up cooperating that maybe somehow I may be able to get some benefit from that.

(*Id.* at pg. 42). Although believing that the task would be "monumental" in light of Fawell's anti-Government feelings, Coutretsis set out on her plan to convince Fawell to cooperate. (*Id.*) She testified at the October 28, 2004 hearing that she hoped that Fawell would cooperate because she knew "how [Fawell] felt about me and the kids, that he would put us first; and if there was a benefit to be had, that he would try to let us use it." (*Id.*) The 2003 Agreement required

14

Coutretsis to cooperate in the Government's Secretary of State and McPier cases but she was not obligated to attempt to convince Fawell to cooperate. (*Id.* at pg. 32). The Government never asked or encouraged her to try to make Fawell cooperate and informed Coutretsis that in doing so she was not acting as the Government's agent. (*Id.* at pg. 45).

During her December 26, 2003 trip to Yankton, Coutretsis instigated her plan to convince Fawell to cooperate. (*Id.* at pg. 43). According to Coutretsis' testimony, her intent during that visit was to

> Try to convince [Fawell] that the process [of cooperating with the Government] was fair, that [she] had been treated fairly; that [she] was never asked to push any lines, to go into any gray areas; that [she] was very comfortable; that if [she] ever had to sit in a courtroom at a different trial, that [she] would be comfortable; that at least the person [she] was talking against would know that [she] was telling the truth ... and ... [did not] come up with some vague thing just to make something up.

(*Id.*) The "process [to convince Fawell to cooperate ultimately lasted] several months, many visits, many hours of conversations going back and forth until [Fawell] finally got to the point that he said, 'Yeah, I think I can do this, and I'm comfortable with my decision.'" (*Id.* at pg. 49).

The court concludes that Coutretsis was needed to facilitate Fawell's cooperation because she had access to Fawell along with his trust. It is likely that Fawell's anti-Government views would have prevented him from ever cooperating with the Government even with the pressure of the McPier indictment in February 2004.[10] As an example, Fawell traveled from Yankton to

---

[10] Fawell is credited with making several statements during his telephone conversations with Coutretsis in February 2004 about the effect of the McPier indictment. The McPier indictment was returned by the grand jury on February 10, 2004. (04 CR 147, Dkt. No. 1). On February 17, 2004, Fawell stated that "he had taken enough bullets in the game," and that he felt that the Government figuratively had a "foot on his throat." (*Id.* at pg. 88). On February 28, 2004, Fawell analogized his situation of going to trial in the Citizens for Ryan case and facing a second trial in the McPier case to the death of General George Armstrong Custer at the Battle of

Chicago for a court appearance in the McPier case in March 2004. The journey lasted two weeks and required a significant stay at the Bureau of Prisons facility in Oklahoma City, Oklahoma. Coutretsis and Fawell believed that the two-week length of the trip was an intentional effort by the Government to "mentally break down" Fawell.[11] (*Id.* at pg. 62.) Coutretsis said that this was a set back in her efforts to get Fawell to cooperate and that she had to "smooth things back out." (*Id.* at pg. 65). According to Coutretsis, Fawell ultimately decided to cooperate by the end of May 2004. (*Id.* at pg. 66).

Furthermore, Coutretsis was a person who has been, and appears to continue to be, supportive of Fawell. The decision to cooperate was one that placed Fawell in conflict with many people who had previously supported Fawell. Fawell made reference to this conflict during his October 28, 2004 testimony by stating that "both George Ryan and Larry Warner are friends of mine. I don't relish testifying against George Ryan, Larry Warner, or anybody else ... I've always been very loyal." (*Id.* at pg. 96). Fawell had a long professional relationship with Ryan including working as his campaign manager and chief of staff. The court concludes that testifying against Ryan and Warner in open court during the Ryan trial was not an easy task for Fawell. Coutretsis

---

(Continued...) the Little Bighorn saying that he had "fought the Indians once and then there's another 400 coming over the hill." (*Id.* at pg. 89).

[11] Fawell sniped in his October 28, 2004 testimony, "It's a long flight [from Yankton to Chicago]. It took about two weeks, I think." (*Id.* at pg. 78). Fawell was transferred from Yankton to the MCC in Chicago for a court appearance via the Bureau of Prisons Federal Transfer Center in Oklahoma City, Oklahoma. The court presumes that it is likely the Bureau of Prisons, in an effort to prudently spend taxpayer resources, would have waited to transport Fawell from Oklahoma City until a full contingent of prisoners was ready for transport to Chicago. There is no evidence in the record to suggest that Fawell was treated any differently than any other prisoner being transported by the Bureau of Prisons for a court appearance or that the Government attempted to "mentally break down" Fawell in an effort to coerce his cooperation.

supported Fawell during this period and her support of Fawell aided the Government by helping to insure that Fawell completed his end of the bargain of testifying at the Ryan trial.

    2. Determining if this Court will be able to Impose an Appropriate and Reasonable Sentence under the Proposed Plea Agreement

    Coutretsis' Presentence Investigation Report calculates her Criminal History Category as I, and her offense level total as 13, and which, before any recognition for her cooperation pursuant to § 5K1.1, results in an advisory sentencing Guidelines range of 12 to 18 months imprisonment. Pursuant to § 3553(a)(2)(A), this court notes the seriousness of intentionally lying to a grand jury. Coutretsis lied on several occasions in an effort to obstruct the Government's investigation into misconduct occurring during former Governor George Ryan's administration. The court, pursuant to Congress' direction under 28 U.S.C. § 994(n) and Guidelines § 5K1.1, recognizes the need for insider cooperation. The court concludes that Coutretsis helped to facilitate Fawell's cooperation. This court also notes, pursuant to § 3553(a)(1), considering the history and characteristics of Coutretsis, the evidence reflects that Coutretsis has truthfully cooperated with the Government since her initial decision to cooperate in 2003.

    This court also concludes that there are no public policy factors presented by the proposed plea agreement that would undermine the public's respect for the law. 18 U.S.C. § 3553(a)(2)(A). Coutretsis and Fawell were primarily motivated by a common desire to limit their time spent away from one another and Coutretsis' children. There is no evidence that either one of them was "duped" into cooperating with the Government. The Government properly brought the various charges set forth in this case and the McPier case because a grand jury found probable cause that the charged crimes occurred. The Government admonished Coutretsis that she was not a

Government agent and her decision whether to discuss the concept of cooperation with Fawell was her's alone to make. The Government did not force Coutretsis to facilitate Fawell's cooperation. Coutretsis' attorney, Ms. Giacchetti, helped Coutretsis develop the idea of facilitating Fawell's cooperation but this is a proper act within Ms. Giacchetti's role as Coutretsis' attorney. There is no evidence that Ms. Giacchetti suggested to Coutretsis that she should manipulate Fawell or engaged in any inappropriate conduct.

## CONCLUSION

For the reasons set forth above, this court informs the parties that it tentatively accepts the proposed amended plea agreement pursuant to Rule 11(c)(4). Coutretsis' advisory Guidelines sentencing range of imprisonment is zero months to 12 months and a day. The court will determine the appropriate sentence by applying the factors set forth in 18 U.S.C. § 3553(a) after hearing from counsel and the defendant on July 31, 2006. Sentencing is scheduled for July 31, 2006 at 1:30 p.m.

ENTER:

*James F. Holderman*
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: July 25, 2006